## STATEMENT OF FACTS IN SUPPORT OF CRIMINAL COMPLAINT

I, SAMUEL A. PETTIGREW, BEING DULY SWORN DO HEREBY DEPOSE AND STATE:

I am a Special Agent with the United States Department of State Diplomatic Security Service, assigned to the Criminal Fraud Investigations Branch. I have been a Special Agent with the Diplomatic Security Service for five years. During my career in federal law enforcement I have conducted or participated in numerous investigations involving false statements and conspiracy. As a Diplomatic Security Service agent, one of my responsibilities is to investigate allegations of false statements and conspiracy to commit crimes, including statutes under Title 18 of the United States Code. These violations often involve federal employees and associates.

I am presently investigating the activities of a Drug Enforcement Administration ("DEA") Special Agent, Leonardo Silva, who is the Resident Agent in Charge of the DEA's field office in Monterrey, Mexico. My investigation has revealed that Silva provided false information that caused two Mexican citizens to have their visas revoked; submitted false time and attendance records in Mexico; and submitted false Department of Justice ("DOJ") financial disclosures in Mexico. These illegal activities are under the jurisdiction of agencies of the United States—specifically the Department of State and the DEA, a component of the DOJ. This affidavit is submitted in support of a Criminal Complaint charging this individual with violations of Title 18 U.S.C. §§ 371, 1001.

On April 7, 2014, the DOJ Office of Inspector General received information from the Department of Homeland Security Investigations, Office of Professional Responsibility, that a reliable source reported that Silva intentionally caused three U.S. Non-Immigrant Visas to be revoked as a "favor" for a Mexican citizen, Co-Conspirator 2. According to the source, Silva was guaranteed post-retirement employment as the director of security for a private security business in exchange for revoking the visas. I conducted an investigation to evaluate these allegations. My investigation has revealed that Silva—acting at the direction of Co-Conspirator 1, a Mexican national—caused visas for two Mexican nationals to be revoked.

A review of DEA emails reveals that Silva requested that the Department of State revoke V-1's visa. On November 7, 2012, Silva sent an email to a Department of State employee in Monterrey, Mexico, requesting help in cancelling a visa and providing the name and the date of birth of the person whose visa he wanted cancelled. The date of birth Silva provided was identical to V-1's date of birth. While the name Silva provided was not V-1's exact name, it was similar to V-1's name. Silva wrote of this person: "she is an extremely unstable person who has verbally assaulted numerous individuals while on one of her cocaine fueled narcotics binges.... At this point our investigation would be enhanced if her visa were to be cancelled."

1

On February 5, 2013, Silva inquired about the status of his previous request to cancel the visa, and the Department of State employee requested additional information about the person. Silva replied on February 6, 2013, stating "she is involved in the distribution of cocaine in San Pedro and is herself a heavy user." Silva added, "she is working with the BELTRAN-Leyva organization." On February 7, 2013, the Department of State employee indicated that she was unable to find an exact match for the name Silva initially provided and Silva suggested a different version of V-1's name. Once again, this version was close to V-1's name, but not an identical match. Based on the variations of V-1's name that Silva provided, though, the Department of State was ultimately able to find an active visa for V-1, and, on February 8, 2013, a Department of State employee informed Silva that V-1 and her husband's visas would be revoked. Within five hours of receiving this email, Silva sent an email to Co-Conspirator 1 stating in Spanish "today I have been talking to the person that has been helping me (sic). Today, they submitted her name and her husband's to cancel the permit. They are fucked!!" Co-Conspirator 1 responded in Spanish, stating "[t]hanks so much friend, excellent news!!! Warrants a cookout next weekend. A big hug." A Department of State database reflects that on April 2, 2013, the information Silva provided was added to the database and that V-1 and her husband, V-2, had their visas revoked based on this information.

On April 13, 2013, V-1 and her husband received letters from the U.S. Consulate in Mexico ("Consulate") informing them that their visas had been revoked. On May 8, 2013, V-1 and her husband went to the Consulate to get more information about the revocation, and they were informed that their visas were revoked based on information that the two were involved in drug trafficking. The two denied any involvement in the drug trade. News of their visit was quickly elevated within the Consulate, and Department of State employees began seeking more information about V-1 and her husband. Silva responded to these Department of State emails by writing, on May 9, 2013, "This lady and her husband are bad news. The female is a cocaine addict and is responsible for distributing cocaine to street level dealers in San Pedro." This response was forwarded among Department of State employees. A Department of State employee commented on the response, noting "[Silva] is the one who requested the revocations. [V-1 and her husband] are apparently friends with [the state governor of the region in which Monterrey is located], as the governor inquired into their cases with the [the Consul General] recently. So it might be worthwhile to at least chat with them."

Two other DEA Agents agreed to meet with V-1 when she came back to the Consulate. And one of these Agents began trying to corroborate the intelligence that Silva provided the Department of State, requesting information from the San Antonio Police Department about V-1's supposed arrest in San Antonio and querying the database the DEA uses to store the intelligence it gathers, which is called the Narcotics and Dangerous Drugs Information System ("NADDIS"). The criteria for listing someone in NADDIS includes, but is not limited to:

1. Persons suspected of drug violations;
2. Persons having knowledge of drug violators or violations, even though they are not suspects themselves; and
3. Persons surfacing in DEA investigations who are suspected of non-drug violations.

Accordingly, if V-1 had really engaged in the drug-trafficking conduct Silva described, her information should have been in NADDIS. On May 9, 2013, over the course of several different emails, the DEA Agent informed Silva that he was unable to find any information for V-1 in the database and that, despite a number of searches, no one could find evidence that V-1 had been arrested in San Antonio.

On May 22, 2013, a Department of State employee reported to Silva and the other DEA Agents that they were unable to locate any record of V-1's arrest despite using both a criminal background check based on V-1's name and a search based on V-1's fingerprints. Accordingly, no later than May 22, 2013, Silva had received notice from both his own organization and the Department of State that the information he provided was inaccurate. On May 28, 2013, the DEA Agent who attempted to corroborate Silva's claims asked him what he wanted to do about the inquiries they were receiving from the Department of State. Silva responded, "I already spoke to [the Consul General] about this. We stand by what we submitted. She will have to reapply and see what happens." Around this time, V-1 and her husband did re-apply for their visas so that they could visit their son and shop in the United States. Their request was denied based on the information Silva added to V-1's file.

Notes entered into a Department of State database on August 5, 2013, state "DEA is absolutely positive of their assessment of this applicant as a narcotrafficker and their information rises above the 'reason to believe' standard." V-1 and her husband ultimately had to retain an attorney to address the revocation and denial of their visas. In January 2014, their counsel met with the visa chief at the Consulate. As a result of this meeting, it was determined that V-1 needed to undergo drug screening and psychological evaluations to demonstrate that the claims about her were, in fact, false. She successfully completed this screening on February 18, 2014. On February 21, 2014, V-1's and her husband's visas were restored.

An analysis of Silva's travel history in and out of Mexico reveals that Silva has flown on approximately 27 private charter flights in 2014; 27 flights in 2013; 18 flights in 2012; 18 flights in 2011; and four flights in 2010. A review of Silva's U.S. bank records did not find any evidence that he paid for any of the private flights from 2010 through 2014. The flight between Monterrey and McAllen takes approximately one hour. A comparison of Silva's travel history on these private planes and his DEA time and attendance records reveals that Silva made false statements on time and attendance records he submitted to a DOJ database, falsely reporting that he worked hours in Monterrey that he could not have possibly worked. By way of example, on April 3, 2013, Silva did not take annual leave and reported that he worked an 8 hour day. But on April 3, 2013, the private aircraft on which Silva flew did not depart McAllen, Texas, until 4:48 p.m. Silva sent an e-mail to a

co-worker stating his arrival time to Monterrey would be 6:30 p.m. and that he would return to the office after his 6:30 p.m. arrival to retrieve his vehicle and "run some errands." Silva's official travel vouchers revealed he was not on travel status on April 3, 2013, for official reasons. Even if it took no time for Silva to run these errands and he worked until midnight, he would have had less than 5.5 hours left in a day on which he supposedly worked 8 hours. Nevertheless, Silva certified in a DOJ database that he worked eight hours on April 3, 2013.

The DEA's Confidential Financial Disclosure Reports for calendar years 2011, 2012, and 2013 instruct employees to report travel reimbursements totaling more than $350 received from any one source during the reporting period. For each of these years, Silva failed to report any gifts or travel reimbursements for himself, his spouse, or his dependent children. Specifically, on February 18, 2014, Silva signed a Confidential Financial Disclosure Reports and certified that he did not receive any gifts for calendar year 2013. An internet search your affiant recently conducted reflects that a private flight from McAllen, Texas, to Monterrey, Mexico, costs between $1,200 and $7,800 per hour. These rates mean that, at the low end of this range, Silva's 27 private flights in 2013 were valued at approximately $32,400 and that, at the high-end of this range, the flights were valued at approximately $210,600.

For these reasons mentioned above, I believe Leonardo Silva, a public official, who is an employee of the Drug Enforcement Administration, conspired with Co-Conspirator 1 to cause false information concerning V-1 to be entered into a Department of State database and thereby obstructed the operation of that Agency, causing it to erroneously revoke V-1's and V-2's visas. Furthermore, I believe Leonardo Silva intentionally made material false statements to the Department of State, in violation of 18 U.S.C. § 1001. Specifically, Silva made a material false statement, in violation of 18 U.S.C. § 1001, on his time and attendance records falsely claiming that he worked 8 hours on April 3, 2013, when, in fact, he did not work that number of hours. In addition, Silva made a material false statement, in violation of 18 U.S.C. § 1001, when he certified on his calendar year 2013 Confidential Financial Disclosure Report that he had not received any gifts during the reporting period.

_____
Special Agent Samuel A. Pettigrew
U.S. Department of State
Diplomatic Security Service

Sworn to before me, and subscribed in my presence, on _____, 2014 at _____, at Washington, D.C.


_____
JOHN M. FACCIOLA
United States Magistrate Judge